McAvoy, J.
It is claimed that the defendant, who was indicted, tried and convicted for a violation of the Penal Law, sections 160 and 161 thereof, which set out the offense described by the legislature as criminal anarchy, is entitled to a certificate that there is a reasonable doubt whether the judgment of conviction against him should stand. The argument for the defendant, going to the substance of the charge against him, is that the indictment itself fails to set forth such facts as would be sufficient to bring the defendant' within the prescribed definitions given to this class of crime. Section 160 is a legislative limitation of what may constitute criminal anarchy. Its prescription is that it is “ the doctrine that organized government should be overthrown by force or violence or by assassination of the executive head or of any of the executive officials of government, or by any unlawful means.” Section 161, subdivision 1, comprises within its terms the “ advocating, advising or teaching the duty, necessity or propriety of overthrowing or overturning organized government by force or violence * * * or by any unlawful means, or printing, publishing, editing, issuing or knowingly circulating, selling, distributing or publicly displaying any book, etc., writing or printed matter containing or advocating, *643 advising or teaching that organized government should be overthrown by force, violence or any unlawful means.” This contention leads to the examination of the article annexed to the indictment, for the publication and dissemination of which the defendant was found guilty of this prescribed crime. The language used in the article attached to the indictment and contained in the so-called Left Wing Manifesto can have no other interpretation, taking it in its natural, ordinary, rational meaning, as interpreted by intelligent and impartial men in the exercise of a sound judgment, than that the publisher and writer intended to call upon the so-called revolutionary proletariat, its adjuncts and sympathizers, to use violent means, through mass action, to a revolutionary struggle to overturn the existing government. The manifesto states that the “ direct objective is the conquest by the proletariat of the power of the state.” It is asserted that revolutionary socialism does not propose to capture the bourgeois parliamentary state, but to conquer and destroy it. It repudiates the policy of introducing socialism by means of legislative measures on the basis of the bourgeois state. It is urged that the revolutionary proletariat must expropriate all political power, the army, the police, industry and the press, by annihilating the political power of the bourgeoisie' now in control of the capitalistic state. Its proposition is to conquer by means of ‘ ‘ political action in the revolutionary Marxian sense, which does not simply mean parliamentarianism, but the class action of the proletariat in any form, having as its objective the conquest of the power of the state.” It sets forth that the proletariat cannot conquer power by means of the bourgeois parliamentary state, but that it must organize a new state — “ the state of the organized producers.” It intends to go forward “ under the impulse’ *644 of the crisis ” and to have the proletariat act for tk$ conquest of power by means of mass action. The reader is told that “ the final objective of mass action is the conquest of the power of the state, the annihilation of the bourgeois parliamentary state and the introduction of the transition proletarian state, functioning as a revolutionary dictatorship of the proletariat.” It is necessary, therefore, according to the tenor of the article, that the proletariat organize its own state “ for the coercion and suppression of the bourgeoisie.” While it is apparently conceded, although not avowedly so, that the printing and publishing of this matter is the advocating, advising and teaching that organized government should be overthrown by force and violence and unlawful means, there is derived from the classical definition of anarchy the deduction that the legislative intent was not to punish such advocacy alone unless it contained within its proposal the substitution of no regulated or unregulated control of governmental functions, so as to leave .society in a condition of anarchical chaos, bounded by no restraint, whether of dictatorship or democratic rule. There is said to be no novel concept of the social doctrine or philosophy which was heretofore known as anarchy in the legislative mind; that the intent was to prescribe punishment solely of the advocacy of the abolition of all government; that the destruction of the existing state by revolutionary means and the erection upon its ruins of a new form of government of whatever type cannot be deemed to have been contemplated as a crime to be covered by the provisions of these -sections of the Penal Law as enacted. This view is wholly untenable; it is denied' by the language of the statute. While the common acceptation- of the term anarchy and its definition in dictionaries and encylopedias of repute indicates that *645 forceful revolution, followed by the erection of a new state, is not anarchical in the philosophic sense, yet, when there is a specific, definite pronouncement by the legislative body as to what in its judgment shall be termed criminal anarchy, there is no necessity of resort to purely etymological construction. It seems to me that there can be no reasonable doubt that such advocacy through publishing and circulating printed matter containing the doctrines set forth in the manifesto is well within the description and intendment of the Penal Law sections which are said to have been offended. Unless this construction be the true one, forceful revolution, looking toward usurping the functions of the state through actions of any class for its own benefit, is not punishable, providing the revolutionists propose some sort of organized government in place of the existing one. There is error also asserted in that the trial court received testimony of a witness concerning alleged occurrences during a strike in the month of May, 1919, which occurred in Winnipeg, Canada. It is asserted that as to most of the evidence which he gave concerning the occurrences in that’ strike he did not possess direct knowledge, and that such occurrences were not referred to in the publication for the issuance of which the defendant was indicted, and were not referred to in the indictment itself. I have read the testimony of the witness, and I find that continuously throughout his narrative there is a sedulous care upon the part of the trial court to determine whether or not he had personal knowledge of the occurrences which he detailed. Most of the incidents of the general strike there which he described were of his personal observation, and I cannot find that much of the irrelevant or incompetent matter from that standpoint was admitted. The theory upon which this evidence was allowed was that in the mani *646 festo there appears an allusion to events in Seattle and Winnipeg during the so-called general strikes held there, as follows: “ Strikes are developing which verge on revolutionary action and in which the suggestion of proletarian dictatorship is apparent, the striker-worker trying to usurp functions of municipal government, as in Seattle and Winnipeg.” The People claim its competency and materiality arise from the fact that it is illustrative of the conditions which the advocated general strike and revolutionary mass action will bring about, and indicate the intent of the writer in his advocacy of the scheme through which the existing state may be overthrown. This seems to be good logic, and nothing of error in evidence can be predicated against it. If the defendant did not know what happened in Winnipeg, he is át least bound by the implications of knowledge which arise from his assertion that the result of the activities there was the attempt to usurp functions of municipal government, and, in so far as the evidence tended to support that declaration, it was competent as illustrative of intent in the writing and dissemination of the printed matter complained of. It isi said that no reference to this article or to the incidents at Winnipeg was made in the indictment. The paragraph quoted above is contained in the manifesto which is annexed to the copy of the indictment handed up on this argument, and I assume that counsel is in error in respect to this assertion. It does not seem to me to be an arguable proposition that the admission of this evidence was such error as indicates a doubt of the propriety of the conviction. In the court’s, charge he referred to ‘ ‘ the evidence of what did occur in Winnipeg ” and submitted the question to the jury, “ Was that a violation of law? ” This seems to me to be an incorrect interpretation of the tenor of the *647 charge at that point. The proposal to the jury was not whether the action of the strikers in Winnipeg was a violation of Canadian law, but whether or not under the laws of New York such acts, if committed here, would constitute the usurping after overthrow of functions of muncipal government, and be thus the accomplishment of the overthrow of organized government here through unlawful means as prohibited by the laws of New York. It is said that there was no evidence that the acts of the strikers, if committed in New York, would have been a violation of law, but the court was careful to charge exactly what acts could be accomplished and effected through a combination of persons engaged in-a strike. Prejudice is predicated, too, on the charge of the trial court quoting opinions in a case which arose under section 675 of the Penal Code. This -section describes acts as a misdemeanor which contrive to disturb the public peace through soliciting, inciting, encouraging, persuading and procuring persons to commit acts of violence upon the persons and property of others, and to raise and make insurrections, riots, routs and unlawful assemblies within the state. The defendant was indicted under this section in the third count of the indictment found against him, but this count was withdrawn from the consideration of the jury. The damage to the defendant is claimed to have arisen through the court’s quoting at length, as applicable to. the indictment under the first and second counts and as interpretative of the Criminal Anarchy Statute, from the decision of the Appellate Division in the case of People v. Most, 71 App. Div. 160, and from the decision upon affirmance of this judgment in the Court of Appeals. This interpretation of the court’s charge departs from the reasons and surroundings of the use of these decisions in the charge. The obvious *648 intent and purpose of the quotation of the principles of law enunciated in these opinions was to inform the jurors as to the defendant’s right to freely express and publish his opinions with impunity respecting governments, magistracies or individuals, providing such act did not disturb the public peace or attempt to subvert the government. It was pointed out as applicable to the argument that the defendant’s right of free speech and free publication of his sentiments was not inclusive of a right or a sanction of unbridled license nor an authorization of publication of articles prompting the commission of crime or the overthrow of government by force, and as not including appeals designed to destroy the reputation of the citizen, the peace of society or the existence of government. I conclude as to this contention that there is not suffi cient doubt about the accuracy of the instruction to warrant a certificate that it ought to be reviewed. The submission to the jurors of the question whether or not the conspiracy law was violated is charged to be erroneous because the specific acts condemned under the so-called conspiracy section were not specifically set out in the indictment. This construction of the submission of the case to the jury departs from a consideration of the allegations of the indictment in respect to the crime therein charged. The crime therein alleged is not the commission of any act which is comprehended in these unlawful means, but the crime of publishing and circulating the printed matter teaching the doctrine that organized government should be overthrown by unlawful means. The prime fact to be charged was the publication and its content of advice and teaching of means which the law declares to be prohibited to any person to use. It was, therefore, not necessary as a matter of pleading or in any logical sense of a declaration of the crimel *649 to set forth what were the specific means, unlawful in themselves, which the defendant advocated in the article which he published. This seems quite certain to me and to almost exclude doubt. Besides a review of these which are alleged as principal defects in the conduct of the trial I have reviewed the case in its entirety, with a view to determining whether, upon the whole record, the issue was fairly presented, having an eye to the rights of the defendant to be legally tried for a crime, and have concluded that, upon the whole case, the result was almost imperative upon the evidence presented. Motion for certificate of reasonable doubt denied.
Motion denied.